**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| HEN KY TON,<br><br>　　　　　　　Petitioner,<br><br>　　v.<br><br>KRISTI NOEM, *et al.*,<br><br>　　　　　　　Respondents. | Case No. ED CV 25-3348-DMG (DSR)<br><br>**ORDER RE MOTION FOR PRELIMINARY INJUNCTION** |

　　　On December 11, 2025, Petitioner Hen Ky Ton, a noncitizen who is incarcerated at the Adelanto Detention Facility in Adelanto, California and subject to a final order of removal, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. Ton argues, *inter alia*, that he was re-detained in violation of due process and Respondents'[1] own regulations. He seeks emergency injunctive relief including his immediate release from custody, a prohibition against removing him from the United States or this District,

---

[1] Respondents are Kristi Noem, the Secretary of Homeland Security; Pamela J. Bondi, the Attorney General of the United States; Thomas Giles, the Los Angeles Field Office Director, Bureau of Immigration and Customs Enforcement; James Pilkington, Assistant Field Office Director, Adelanto Detention Facility; and Warden, Geo Group Inc., Adelanto Detention Facility.

and reinstatement of his prior order of supervision ("OSUP"). *See* Motion for Preliminary Injunction ("MPI") [Doc. # 3].

Ton initially filed an application for temporary restraining order, which the Court converted to an MPI to facilitate a modified briefing schedule and an orderly resolution of the motion. [Doc. # 6.] Respondents have filed an opposition [Doc. # 8], and Ton filed a reply in support of the MPI. [Doc. # 9.] For the reasons discussed in this Order, the Court **GRANTS** the MPI and directs Respondents to immediately release Ton from custody subject to his prior conditions of release.

## I.
## BACKGROUND

### A. Ton's Allegations

According to the verified allegations of the Petition and Ton's supporting declarations,[2] Ton came to the United States as a refugee from Vietnam on January 24, 1990, when he was 15. Petition at 3[3]; Ton Decl. ¶ 1 [Doc. # 9-1]. He was convicted of robbery[4] in 1996. Petition at 3; Ton Decl. ¶ 2. On September 9, 1997, an immigration court ordered his removal. Petition at 3; Ton Decl. ¶ 2. He appealed the order, and his appeal was dismissed on June 29, 1998. Petition at 4; Ton Decl. ¶ 2. Because Vietnam refused to accept pre-1995 Vietnamese immigrants for deportation at that time, he was detained until July 21, 1999, when he was granted supervised release. Petition at 3; Ton Decl. ¶ 3.

---

[2] Ton's declarations are not signed by him. His counsel represents that he is unable to obtain Ton's physical signature due to his status in detention and the exigency of the briefing schedule, but Ton knows the contents of the declarations and has authorized his counsel to sign them on his behalf. *See* Reply at 8 n.2 [Doc. # 9-1]. Counsel shall obtain his client's signature and file signature pages for Ton's declaration and supplemental declaration [Doc. ## 9-1, 9-2] as soon as practicable after Ton's release from custody.

[3] Citations to the record are to the CM/ECF pagination.

[4] According to the declaration of Officer Jorge Suarez, Ton was in fact convicted of First-Degree Burglary. [Doc. # 8-1 ¶ 7.]

For the next 25 years, Ton maintains that he checked in with immigration authorities on time and without incident. Petition at 3. He has two grown children and resides in Baldwin Park, California with his wife and daughter. *Id.*

On November 14, 2025, U.S. Immigration and Customs Enforcement ("ICE") detained Ton at his regularly scheduled check-in. *Id.*; Ton Decl. ¶ 5. Ton states that he was not told by officers why his supervised release was being revoked and that as of December 19, 2025, he has not been given a hearing or any opportunity to challenge his detention. Ton Decl. ¶ 5.

### B. Government's Opposition

The Government relies on the order of the Honorable Cormac J. Carney, U.S. District Judge, on cross-summary judgment motions in *Trinh v. Homan*, 466 F. Supp. 3d 1077 (C.D. Cal. 2020), for certain background facts about the ability to obtain travel documents for Vietnamese nationals through 2020, as well as various documents and the declaration of ICE Enforcement and Removal Operations Deportation Officer Jorge Suarez.

#### 1. *Trinh v. Homan*[5]

After the Vietnam War, waves of people from the former Republic of Vietnam fled the country to escape political persecution, including hundreds of thousands of refugees who entered the United States. *Trinh*, 466 F. Supp. 3d at 1083. Between the end of the Vietnam War and 2008, Vietnam refused to repatriate any Vietnamese immigrants who were ordered removed from the United States. *Id.* In 2008, Vietnam agreed to consider repatriation requests for Vietnamese immigrants who had arrived in the United States after 1995 but maintained its policy of non-repatriation for pre-1995 Vietnamese immigrants.

---

[5] Although the Court may take judicial notice of public records, such as court orders, the Court generally cannot take judicial notice of disputed facts in those records. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018). The historical facts about diplomatic relations between Vietnam and the United States are not generally in dispute for purposes of this Order.

*Id.* Thus, ICE generally released pre-1995 Vietnamese immigrants into the community after an initial 90-day mandatory detention period expired. *Id.*

In 2017, ICE entered into "somewhat successful" negotiations with the Vietnamese government, with Vietnamese officials verbally committing to begin considering ICE travel documents for pre-1995 Vietnamese immigrants on a case-by-case basis, without explicitly committing to accept any of them. *Id.* at 1084. ICE then began to detain immigrants with final orders of removal for more than 90 days based on the possibility that Vietnam might issue the requisite travel documents, as well as re-detaining some immigrants who had been released on OSUPs. *Id.*

In 2018, ICE reversed its position—again—after meeting with Vietnamese officials, conceding that in general, the removal of pre-1995 immigrants was still not significantly likely. *Id.* ICE instructed field offices to resume releasing pre-1995 Vietnamese immigrants within 90 days of a final order of removal, an order which remained in place in 2020 when Judge Carney issued his order in *Trinh*. *Id.*

### 2. Suarez Declaration and Supporting Documents

In support of Respondents' Opposition, Officer Suarez states that he has reviewed Ton's case and documents. Suarez provides a copy of the immigration judge's September 9, 1997 order of removal. [Doc. # 8-2 at 2.] Like Ton, Suarez states that on June 29, 1998, the Board of Immigration Appeals dismissed Ton's appeal, so that the removal order became final. Suarez Decl. ¶ 10 [Doc. # 8-2]. Officer Suarez also states that Ton was released under an OSUP on July 22, 1999. *Id.* ¶ 11.

According to Suarez, the OSUP required that Ton comply with certain conditions, including assisting DHS to obtain any necessary travel documents, providing DHS with written copies of requests to embassies or consulates for the issuance of a travel document, and providing DHS with written responses to those requests. *Id.* Suarez further claims that Ton failed to comply with his OSUP "by failing to secure his travel documents to Vietnam; and engaging in employment without valid work authorization." *Id.* ¶ 12. Officer Suarez does not provide a copy of Ton's OSUP.

According to Officer Suarez, when Ton was taken into custody on November 14, 2025, he was also served with a Warrant of Removal/Deportation (which notified him that DHS intended to execute his final removal order and process him for removal to Vietnam) and a Notice of Revocation of Release. *Id.* ¶¶ 14–15. The Notice of Revocation of Release indicates that the reason for the removal is that "ICE has determined that you can be removed from the United States" and that the redetention is pursuant to 8 C.F.R. § 241.4(l) and 241.13(i).[6] [Doc. # 8-2 at 2.]

Also on November 14, 2025, Officer Suarez states that Ton was given an informal interview so that he could respond to the reasons for the revocation and provide evidence to show his removal is unlikely. Suarez Decl. ¶ 16. Suarez provides a copy of a form documenting that an informal interview was conducted on that date. [Doc. # 8-4 at 2.]

On November 16, 2025, according to Suarez, DHS advised Ton that he could request DHS notify Vietnam's consular officers about his custody situation and of his right to speak to such consular officers. Suarez Decl. ¶ 17. Ton requested the notification, and the next day, DHS faxed the Embassy of Vietnam regarding Ton's detention. *Id.* ¶ 18.

On November 21, 2025, according to Suarez, DHS conducted a travel interview with Ton. *Id.* ¶ 19. On December 1, 2025, DHS submitted a travel document request to the Embassy of Vietnam, which remains pending for active consideration by Vietnam. *Id.* ¶ 20. Officer Suarez states—

> Vietnam has been issuing travel documents when DHS has made such requests for Vietnamese nationals, including for pre-1995 immigrants. DHS has indeed recently been able to timely obtain travel documents and effectuate removals to Vietnam. The estimate[d] time for production of a [travel document] to Vietnam varies between 30 and 60 days. DHS expects that a travel document for TON will soon be issued. . . . DHS intends to remove TON to Vietnam. Hence a request for removal to a third country has not been made.

---

[6] Officer Suarez states that the Notice of Revocation includes that a reason for the revocation was that Ton failed to provide his travel documents. Suarez Decl. ¶ 15. The Notice does not say this. [*See* Doc. # 8-2 at 2.]

*Id.* ¶¶ 21–22.

### C. Ton's Reply

#### 1. *Nguyen v. Scott*

For his part, Ton cites to the findings of fact from an order issued by the Honorable Tiffany M. Cartwright, U.S. District Judge, which discusses more recent developments related to Respondents' ability to obtain travel documents for pre-1995 Vietnamese immigrants. *See* Reply at 7 (citing *Nguyen v. Scott*, 796 F. Supp. 3d 703, 714 (W.D. Wash. 2025)). In that order, which granted a motion for a preliminary injunction, Judge Cartwright found that after the events set forth in *Trinh*, on November 21, 2020, the United States and Vietnam entered into a Memorandum of Understanding ("MOU") regarding pre-1995 immigrants. *Nguyen*, 796 F. Supp. 3d at 714. The MOU included four conditions from Vietnam, the fourth of which was not disclosed publicly:

> The individual must (1) have Vietnamese citizenship and not the citizenship of any other country; (2) have been ordered removed by the United States and finished serving any U.S. prison sentence; and (3) have resided in Vietnam before arriving in the United States and not have the right to reside in any other country. . . .

*Id.* The MOU stated that Vietnam intended to accept the removal of individuals who met those conditions. *Id.*

On June 9, 2025, ICE rescinded its policy of generally finding that pre-1995 Vietnamese immigrants were not likely to be removed in the reasonably foreseeable future. *Id.* at 715.

#### 2. Ton's Supplemental Declaration and Documents

Ton submitted his declaration [Doc. # 9-1] and supplemental declaration [Doc. # 9-2] in support of his Reply. These declarations conflict with Officer Suarez's declaration in several respects.

First, Ton denies that he failed to comply with any of his conditions of release. Ton Decl. ¶ 4. Ton also provides a copy of his OSUP, which, contrary to Officer Suarez's

-6-

characterization, appears to include no requirement that he provide DHS with written copies of requests to embassies or consulates for the issuance of a travel document or that he provide DHS with written responses to those requests. [*See* Doc. # 9-3 at 2.]

Second, Ton denies that he was given any notice of the reason for his revocation of release on November 14 or that he has been given a hearing or opportunity to challenge his detention thereafter. Ton Decl. ¶¶ 4–5. *But see* Notice of Revocation of Release [Doc. # 8-2 at 2] and Alien Informal Interview form [Doc. # 8-4 at 2]. This appears to contradict Suarez's attestation and supporting documentation that Ton was given an informal interview on November 14, 2025, with an opportunity to provide evidence to show his removal is unlikely. *See* Suarez Decl. ¶ 16; Doc. # 8-4 at 2.

## II.
## DISCUSSION

### A. Legal Standard

Pursuant to Federal Rule of Civil Procedure 65(b), a court may grant a preliminary injunction to prevent "immediate and irreparable injury." A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the [petitioner] is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain such relief, a petitioner must establish four elements: (1) a likelihood of success on the merits, (2) the petitioner will likely suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in her favor, and (4) the public interest favors an injunction. *Winter*, 555 U.S. at 20.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24.

### B. Likelihood of Success on the Merits

#### 1. *Zadvydas v. Davis*

Ton's first argument is that he has been detained in violation of due process under the principles set forth in *Zadvydas v. Davis*, 533 U.S. 678 (2001).

In 2001, the Supreme Court held that a person who has lawfully entered the United States and is subject to a final order of removal cannot be held indefinitely under the authority of 8 U.S.C. § 1231(a)(6). *Zadvydas*, 533 U.S. at 682.[7] The Court noted that after the entry of a final order of removal, there is a 90-day statutory period during which detention is mandatory. *Id.* at 683 (citing 8 U.S.C. § 1231(a)(2)). Subsequently, the Government "may" detain or release the noncitizen under section 1231(a)(6), with certain regulations providing for periodic reviews to determine whether further detention or release is warranted. *See id.*

The *Zadvydas* court read section 1231(a)(6) to implicitly limit a noncitizen's post-removal-detention to "a period reasonably necessary to bring about that [noncitizen's] removal from the United States" and not to permit "indefinite detention." *Id.* at 689. The Court announced a presumption: after six months, "once the [noncitizen] provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.* at 701. "This 6–month presumption, of course, does not mean that every [noncitizen] not removed must be released after six months. To the contrary, [a noncitizen] may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.*

Ton is entitled to the six-month presumption in *Zadvydas*. His most recent detention began on November 14, 2025. But he was previously detained between at least June 29, 1998 (when the BIA dismissed his appeal and his removal order became final, Suarez Decl. ¶ 10) and July 22, 1999 (when he was released under an OSUP, Suarez Decl. ¶ 11). *See* Reply at 6. Thus, he has been detained for an aggregate period of at least approximately 14 months.

---

[7] Contrary to Respondents' arguments, *Zadvydas* also holds that the Court has jurisdiction over such a claim of violation of due process. 533 U.S. at 688.

1  The Government provides no argument or authority that Ton's time in detention
2  should not be aggregated. *See* Opp. at 9–10. Based on the Court's own research, other
3  Districts in the Ninth Circuit and throughout the country consider time in detention in the
4  aggregate when applying the presumption from *Zadvydas*, even when there are intervening
5  periods of decades. *See, e.g., Phan v. Warden of Otay Mesa Det. Facility*, No. 25-CV-
6  02369-AJB-BLM, 2025 WL 3141205, at *3 (S.D. Cal. Nov. 10, 2025) (cataloguing cases
7  discussing "the vast majority of case law interpreting *Zadvydas*"); *Asfestani v. Current or
8  Acting Field Office Director*, No. 1:25-CV-1562-SCR, 2025 WL 3677321, at *4 (E.D. Cal.
9  Dec. 18, 2025); *Thanh Vo v. Bondi*, No. 2:25-CV-02244-DGE-GJL, 2025 WL 3653722, at
10 *3 (W.D. Wash. Dec. 17, 2025). The Court does so as well, joining the vast majority of
11 courts to consider this issue and reason that a different rule would allow release and re-
12 detention to circumvent *Zadvydas*. *See Nugyen*, 796 F. Supp. 3d at 722.

13 Ton also provides good reason to believe there is no significant likelihood of his
14 release in the reasonably foreseeable future. In addition to the historical context discussed
15 above with regard to pre-1995 Vietnamese immigrants, he cites to the finding of the
16 Honorable David O. Carter, U.S. District Judge, that "[b]etween September 2021 and
17 September 2023, only four Vietnamese immigrants who came to the U.S before 1995 were
18 given travel documents and deported. . . . ICE made several requests during this time
19 period that were not granted by the Vietnamese government." Order at 2, *Tran v. Noem,
20 et al.*, ED CV 25-2881-DOC (KS) (Nov. 7, 2025) (citing Asian Law Caucus, *Resources on
21 Deportation of Vietnamese Immigrants Who Entered the U.S. Before 1995* (Jul. 15, 2025)).
22 In addition, the Court notes that it has been more than 26 years since Ton's order of removal
23 became final, and the Government has been unable to effectuate his removal. All these
24 facts support a finding that there is no significant likelihood of Ton's release.

25 The Government has not come forward with evidence sufficient to show that there
26 is a significant likelihood of Ton's removal in the reasonably foreseeable future and to
27 rebut the presumption. The Government's primary argument is it has "requested" travel
28 documents from Vietnam. Opp. at 9. The Government relies on a 2017 order from a case

in which Ghana, the petitioner's country of citizenship, had agreed to issue a travel document for the petitioner. There, the court concluded the petitioner "had not provided good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *See Muthalib v. Kelly*, No. SA CV 16-02186-KS, 2017 WL 11696616, at *3 (C.D. Cal. Apr. 19, 2017). Similarly, in *Diouf v. Mukasey*, 542 F.3d 1222, 1233 (9th Cir. 2008), "ICE successfully completed the arrangements for [the petitioner's] removal." Ton's case, and the historical complexities of obtaining travel documents for pre-1995 Vietnamese immigrants, are a far cry from the situations in *Muthalib* and *Diouf*. The mere request for travel documents that the Government believes will issue within 30 days is not enough to rebut the presumption in this context. *See, e.g.*, *Tran v. Scott*, No. 2:25-CV-01886-TMC-BAT, 2025 WL 2898638, at *4 (W.D. Wash. Oct. 12, 2025) (evidence that travel document had been requested was insufficient where there was no data about the proportion of other pre-1995 Vietnamese immigrants for whom travel document requests were successful).

The Government's other piece of "evidence"[8] is a citation to a case that was dismissed as moot after travel documents were obtained for a pre-1995 Vietnamese immigrant. *See Huynh v. Semaia*, CV 24-10901-MRA (MBK) (C.D. Cal.). Evidence that one person has recently been repatriated, in a vacuum, does little to support the Government's position without supporting evidence of the percentage of travel document requests for pre-1995 Vietnamese immigrants that are approved or why Ton's request for travel documents is similarly situated to Huynh's in relevant respects. *Accord Hoac v.*

---

[8] To the extent the Government relies on Judge Carney's opinion in *Trinh* as evidence to deny the MPI, the Court is not persuaded. First, the discussion of the ability to obtain travel documents for Vietnamese immigrants in *Trinh* is more than five years old and, as discussed throughout this Order, the situation is evolving and individualized. Second, the basis for the 2020 Order was that a "small but non-negligible" portion of travel documents were issued on an individualized, case-by-case basis. 466 F. Supp. 3d at 1089–90. That conclusion supports Ton's argument that the Government has failed to meet its burden to show that there is a significant likelihood *Ton* will be one of the handful of people to receive his travel documents in the reasonably foreseeable future.

*Becerra*, No. 2:25-CV-01740-DC-JDP, 2025 WL 1993771, at *5 (E.D. Cal. July 16, 2025) ("Respondents' reliance on [a] single case does not aid the court's analysis. . . . Vietnam has discretion whether to issue a travel document to any individual. The petitioner's removal to Vietnam in [another case] merely demonstrates that on one occasion, an individual was repatriated from the United States to Vietnam.").

As other courts have noted, "the process for procuring travel documents from Vietnam for pre-1995 immigrants continues to be uncertain and protracted" and appears to depend on personalized historical and biographical data. *Nguyen v. Scott*, 796 F. Supp. 3d 703, 722–23 (W.D. Wash. 2025). The Government's citation to another case and Officer Suarez's conclusory statement that Vietnam "has been issuing travel documents" for pre-1995 immigrants without any discussion of when or how often this has occurred are inadequate to show Ton's removal is likely in the reasonably foreseeable future, given the context.

In short, Ton shows a strong likelihood of success on the merits of his *Zadvydas* due process claim.

### 2. Failure To Comply with Regulations

Ton also argues that he is entitled to relief because ICE re-detained him without complying with its own regulations, specifically those that require he be notified of the reasons for revocation of his release and given an initial informal interview promptly after re-detention. *See* Petition at 7 (citing 8 C.F.R. §§ 241.4(l)(1), 241.13(i)(3)).

As an initial matter, the Court finds Officer Suarez's claim that Ton was detained because he did not comply with his OSUP conditions lacks credibility. The notice of revocation that Officer Suarez relies upon does not reflect his characterization of it. Specifically, the notice does not say that Ton "failed to provide [his] travel documents." Suarez Decl. ¶ 15; *see* Doc. # 8-2 at 2. Rather, the notice reflects that the Government believes it can effect Ton's removal. It is unclear how the Government can deem Ton to have failed to provide travel documents *before* he was informed that the Government expected to remove him to Vietnam.

As the Court has previously ruled, ICE's own regulations require that it afford a noncitizen the process set forth in 8 C.F.R. §§ 241.4(l) and 241.13(i) upon redetention to effect removal based on changed circumstances. *See* Doc. # 17 at 5–9, *Hassanzadeh v. Warden*, ED CV 25-2113-DMG (MAA) (Nov. 25, 2025). That includes being provided an initial meaningful opportunity to contest the revocation of Ton's OSUP through an informal interview (including an opportunity to respond to the reasons for his revocation and the ability to submit any evidence or information that he believes shows there is no significant likelihood of his removal in the reasonably foreseeable future.).

The record is inconclusive, however, as to whether Ton received this interview. While Ton appears to deny that he received the interview, there is a document submitted by Respondents that indicates officer "K. Le" interviewed him on November 14 and Ton gave no statement. [Doc. # 8-4 at 2.] Given the disputed facts, the Court declines to further address whether there is a likelihood of success on the merits of the claim that Respondents failed to follow their own regulations.[9]

### C. Irreparable Harm

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). The Ninth Circuit has recognized "the irreparable harms imposed on anyone subject to immigration detention," including "subpar medical and psychiatric care in ICE detention facilities, the economic burdens imposed on detainees and their families as a result of detention, and the collateral harms to children of detainees whose parents are detained." *Id.* "In the absence of an injunction, harms such as these will continue to occur needlessly on a daily basis." *Id.*

---

[9] Ton also asserts that Respondents may intend to remove him to a third country without appropriate procedures for him to argue that he is at risk in such a country. Ton has not come forward with evidence that Respondents intend to remove him to a third country, particularly in light of ICE's request for travel documents from the Vietnamese government. Accordingly, Ton does not demonstrate that injunctive relief relating to the potential of removal to a third country is appropriate at this time.

Thus, under Ninth Circuit law, the very fact of Ton's likely unconstitutional detention constitutes irreparable harm.

### D. Public Interest and Balance of the Equities

The remaining two factors for a preliminary injunction—the balance of equities and public interest—"merge" when the government is the opposing party. *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (quotation marks omitted). When "the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction." *Hernandez*, 872 F.3d at 996. "[B]y establishing a likelihood that [Respondents'] policy violates the U.S. Constitution, [Petitioner has] also established that both the public interest and the balance of the equities favor a preliminary injunction. [I]t is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014) (internal citation and quotation marks omitted). Moreover, the public has a strong interest in upholding procedural protections against unlawful detention.

The harm to Respondents here is minimal. If the Government can truly obtain the necessary travel documents from Vietnam, it is unclear why it could not redetain Ton to effect his removal. Moreover, a party "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. U.S. Immigr. & Nat. Serv.*, 753 F.2d 719, 727 (9th Cir. 1983).

### E. Bond

The security bond requirement of Federal Rule of Civil Procedure 65(c) is waived. The Court has "discretion as to the amount of security required, if any," and it "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003).

# III.
# CONCLUSION

The MPI is **GRANTED** and Respondents shall restore Petitioner Hen Ky Ton to the *status quo ante* by immediately releasing Ton from custody, subject to the conditions of his prior OSUP. Respondents shall not transfer Ton out of this District during the pendency of these habeas proceedings. By **December 29, 2025**, the parties shall file a joint status report regarding Respondents' compliance with this Order, including addressing whether the habeas petition has been rendered moot.

**IT IS SO ORDERED.**

DATED: December 22, 2025

DOLLY M. GEE
CHIEF U.S. DISTRICT JUDGE